

**FILED**

Oct 29 2015, 8:31 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Thomas Cmar
Earthjustice
Oak Park, Illinois

Matthew Gerhart
Earthjustice
Seattle, Washington

Jennifer A. Washburn
Citizens Action Coalition of Indiana
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
VECTREN ENERGY

Robert E. Heidorn
P. Jason Stephenson
Vectren Corporation
Evansville, Indiana

Wayne C. Turner
Patrick A. Ziepolt
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UTILITY
REGULATORY COMMISSION

Gregory Zoeller
Attorney General of Indiana

David Lee Steiner
Deputy Attorney General
Indianapolis, Indiana

Beth Krogel Roads
General Counsel

Jeremy R. Comeau
Assistant General Counsel
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Citizens Action Coalition of Indiana, Inc., Sierra Club, Inc., and Valley Watch, Inc.,

*Appellants-Intervenors,*

v.

Southern Indiana Gas and Electric Co. d/b/a Vectren Energy Delivery of Indiana, Inc.,

*Appellee-Petitioner,*

Indiana Utility Regulatory Commission,

*Appellee.*

October 29, 2015

Court of Appeals Case No. 93A02-1502-EX-110

Appeal from the Indiana Utility Regulatory Commission

The Honorable Angela Weber, David E. Ziegner, and James Huston, Commissioners
The Honorable Jeffery A. Earl, Administrative Law Judge

Administrative Cause No. 44446

**Bradford, Judge.**

# Case Summary

[1]     On January 17, 2014, Appellee-Petitioner Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery of Indiana ("Vectren"), a public utility company which provides electricity to southern Indiana residents, filed a petition with Appellee the Indiana Utility Regulatory Commission ("the Commission" or "IURC") for approval of projects to modify their current coal-powered generating stations so as to meet new EPA standards. The petition also requested financial incentives and reimbursement from ratepayers for costs associated with the projects. Appellants-Intervenors Citizens Action Coalition of Indiana, Inc., ("CAC") Sierra Club, Inc., and Valley Watch, Inc.

(collectively "Appellants") intervened in the action and, in addition to the Indiana Office of Utility Consumer Counselor[1] ("OUCC"), opposed Vectren's petition. Appellants argued that retiring some or all of Vectren's current coal-powered generators and replacing them with new natural gas-powered generators was a more cost-effective plan than Vectren's proposal to install emission controls on its current generators. Ultimately, the OUCC ceased its opposition to Vectren's proposal prior to the Commission's decision.

[2] The Commission found that Vectren's proposal was reasonable and necessary, approved the proposal, and granted Vectren's request for reimbursement of project costs. On appeal, Appellants argue that the Commission failed to make necessary findings on (1) facts material to its determination of the issues and (2) statutory factors required to be addressed prior to authorizing the use of clean coal technology. In response, Vectren claims that Appellants' appeal is moot and that the Commission made all necessary findings. We find that the Commission erred in failing to make findings on the factors listed in Indiana Code section 8-1-8.7-3 and, accordingly, we remand with instructions.

# Facts and Procedural History

---

[1] The OUCC is the state agency representing ratepayer interests in cases before state and federal utility regulatory commissions. Indiana Office of Utility Consumer Counselor, www.in.gov/oucc/ (last visited October 10, 2015).

### i. EPA Action

Vectren is a public utility company which provides electricity to southern Indiana residents. Vectren's baseload electricity generating units include Brown unit 1, Brown unit 2, Culley unit 2, Culley unit 3, and Warrick, all of which are coal-powered generators. In 2012, Vectren received a Notice of Violation ("NOV") issued by the EPA alleging that Vectren's emissions control technology at its Brown units was noncompliant with EPA rules governing sulfuric acid emissions. The EPA also served Vectren with a Clean Air Act ("CAA") Information Request that highlighted concerns with the sulfur emissions at Culley unit 3. Vectren disputed the allegations raised in the NOV. At some point after Vectren's filing of the instant petition and prior to the Commission's ultimate decision, Vectren and the EPA reached a settlement in principle to resolve the outstanding allegations raised in the NOV and the information request. Vectren is also subject to additional recent federal mandates regarding emissions standards, specifically, the Mercury and Air Toxics Standards rule ("MATS") and the Water Pollution Control Act which limit mercury emissions in the air and water, respectively.

### ii. Vectren's Petition

On January 17, 2014, Vectren filed a petition with the Commission for approval of modifications to four of its coal-powered electricity generating facilities—Brown units 1 and 2, Culley unit 3, and Warrick—in order to comply with the MATS rule, the NOV, and the CAA information request.

**3. Relief requested**. Vectren requests approval of clean energy projects and issuance of a CPCN [certificate of public convenience and necessity] to construct, install, and use CCT [clean coal technology] to allow Vectren to comply with the United State Environmental Protection Agency ("EPA") Mercury and Air Toxics Standards ("MATS") rule, the Notice of Violation ("NOV") received for Brown, and a Clean Air Act ("CAA") §114 Information Request received for Culley related to a 2003 federal consent decree.

Specifically, Vectren requests approval to construct, install, and operate the following projects on the Brown Units: an organo-sulfide injection system to inject an organo-sulfide solution into each scrubber at Brown units 1 and 2 to address mercury ("Hg") re-emission…; a soda ash injection system for sulfur trioxide ("$SO_3$") mitigation at Brown units 1 and 2; and a hydrogen bromide injection system on Brown unit 2 to aid the conversion of elementary mercury to oxidized form (collectively, the "Brown Air Projects").

Vectren requests approval to construct, install and operate the following projects on the Culley Units: an organo-sulfide injection system…at the combined scrubber at Culley units 2 and 3 to address Hg re-emission…; and a hydrated lime injection system for $SO_3$ mitigation at Culley unit 3 (collectively, the "Culley Air Projects")….

Vectren requests approval for recovery of its portion of the costs for Alcoa[2] to install an organo-sulfide system at Warrick unit 4 ("Warrick Project").

In addition, Vectren requests approval to construct, install, and operate equipment necessary to control wastewater discharges from the plants at both Brown and Culley as required to comply

---

[2] Vectren owns 50% of Warrick unit 4 along with Alcoa Inc., which owns the other 50%.

with National Pollution Discharge Elimination System ("NPDES") Hg limitations. ["Brown Water Project" and "Culley Water Project"]…. In this Order, we refer to the Brown and Culley Air Projects, the Warrick Project, and the Brown and Culley Water Projects, collectively, as the "Mandated Projects".[3]

Vectren also requests approval of certain financial incentives and approval to defer project costs, including depreciation and operations and maintenance ("O&M") expenses related to the Mandated Projects ("Mandated Project Costs"), for a period up to December 31, 2020, by which time Vectren will propose a recovery mechanism for such costs. In the alternative and to the extent deferral of the Mandated Projects Costs is not permitted, Vectren requests authority to recover the reasonably incurred O&M expenses, including consumables, and depreciation expenses relating to the Mandated Projects through a rate adjustment mechanism. Finally, Vectren requests ongoing review for the Mandated Projects and specific accounting treatment of under/over recovery of the Mandated Projects Costs.

Appellants' App. pp. 10-11, Order of the Commission pp. 3-4.

In April of 2014, CAC, Valley Watch, and Sierra Club intervened in the proceedings and opposed Vectren's proposal.

---

[3] Hereafter, we will refer to the Brown and Culley Air Projects and the Warrick Project collectively as the "Air Projects."

### iii. Evidence Presented to the Commission

[6]     In order to comply with EPA requirements, Vectren could either install additional pollution controls on its existing units or replace its existing units with new electricity-generating sources (*e.g.*, natural gas, wind, solar, etc.) that would be in compliance with the emissions requirements. Vectren hired engineering firm Black & Veatch ("B&V") to compare the total ratepayer cost and relative risk of its proposal to modify existing units (as described above) versus the cost and risks associated with retiring and replacing the non-compliant units. Alcoa engaged the engineering firm Burns & McDonnell for the same purpose with regards to the Warrick unit.

[7]     B&V's report found that the only feasible plans to meet environmental regulations were (1) replacing one or more of Vectren's current units with new natural gas-powered facilities and retiring the remaining facilities, or (2) upgrading the current coal-powered facilities. B&V evaluated twenty-one potential scenarios involving various gas-powered replacement options and a range of potential market and environmental scenarios. B&V concluded that of the twenty-one scenarios, only one offered a small savings over the Mandated Projects proposal. B&V found that the cost savings under this one scenario were "marginal" and conditional on a future market scenario with low natural gas prices and high carbon prices. Tr. Vol. 4, p. 460. Accordingly, B&V concluded that Vectren's plan to modify the existing facilities was the best option in terms of cost to ratepayers.

CAC and the OUCC submitted testimony of experts who felt that the 10-year period used in B&V's analysis was too short to capture accurate long term costs and risks associated with the proposal and that using a 20-year model would be more appropriate. CAC's expert further maintained that, under a 20-year analysis, natural gas-powered generators would be more cost efficient. Vectren responded that it did not perform a 20-year analysis because (1) it did not intend to keep the coal-powered generators in use for that long, (2) that it would be in a better position to determine the best replacement option for those generators in ten years, (3) risks that occur later in the 20-year model are less reliable, and (4) that replacing the current generators immediately would forfeit the money previously invested in those plants for which its customers are currently still paying and which would not be fully depreciated for at least nine years (the Commission referred to such potential forfeitures as "stranded costs"). After reviewing the additional information provided by Vectren, the OUCC ceased its opposition of Vectren's proposal.

### iv. Commission's Findings and Conclusions

The Commission found as follows:

> **5. Commission Discussion and Findings**
>
> **A. CCT, Clean Energy Projcets, and Federally Mandated Compliance Projects**. As an initial matter, we must determine: (1) whether the Culley Air Projects, Brown Air Projects, and Warrick Project constitute CCT under Ind. Code § 8-1-8.8-3 and "clean energy projects" under Ind. Code § 8-1-8.8-2 and (2) whether all of the Mandated Projects are "federally mandated compliance projects" under Ind. Code § 8-1-8.4-2.

**1**. **CCT and Clean Energy Projects**.  Ind. Code § 8-1-8.8-3 defines CCT as: a technology (including precombustion treatment of coal):

(1) that is used in a new or existing energy production or generating facility and directly or indirectly reduces or avoids airborne emissions of sulfur, mercury, or nitrogen oxides or other regulated air emissions associated with the combustion or use of coal; and

(2) that either:

(A) was not in general commercial use at the same or greater scale in new or existing facilities in the United States at the time of enactment of the federal Clean Air Act Amendments of 1990 (P.L.101-549)1; or

(B) has been selected by the United States Department of Energy for funding or loan guaranty under an Innovative Clean Coal Technology or loan guaranty program under the Energy Policy Act of 20052, or any successor program, and is finally approved for such funding or loan guaranty on or after the date of enactment of the federal Clean Air Act Amendments of 1990 (P.L.101-549).

Appellants' App. p. 10.  Based on undisputed testimony that the Brown and Culley Air projects, and the Warrick project would all reduce emissions of pollutants including mercury and sulfur, and that the Mandated Projects were not in general commercial use as of January 1, 1989, the Commission found that the Air Projects all constitute CCT as defined in Indiana Code section 8-1-8.8-3.  The Commission also found that all of the Mandated Projects constituted federally mandated "compliance projects" under Indiana Code section 8-1-8.4-2 because they are designed to achieve compliance with federally mandated requirements.

In regards to Vectren's request for financial incentives, the Commission found as follows:

> **B. Ratemaking and Accounting Treatment**. Vectren requests the creation of a regulatory asset beginning January 1, 2014, to reflect the deferral of the Mandated Projects Costs, including: (1) allowance for funds used during construction using the FERC Uniform System of Accounts requirements; (2) post-in-service carrying costs using vectren's overall cost of capital approved in its last base rate case, Cause No. 43839, on a pretax basis; (3) project-related costs including operating, testing, maintenance, and depreciation; and (4) property taxes associated with the Mandated Projects. Under Ind. Code § 8-1-8.8-11(a), the Commission shall encourage clean energy projects through financial incentives, if the projects are found to be reasonable and necessary.
>
> Alternitvely, Vectren requests to recover the Mandated Projects Costs under Ind. Code ch. 8-1-8.4. Under this proposal, Vectren would recover 80% of eligible revenue requirement amounts through a Federal Mandated Compliance Adjustment ("FMCA"), including financing costs on projects under construction, post-in-service construction costs, deferred O&M, projected incremental depreciation, and property tax expenses. The remaining 20% of the Mandated Projects Costs would be deferred for subsequent recovery in a base rate case.
>
> ****
>
> Based on the evidence presented, we find that Vectren's proposal to defer the Mandated Project Costs is reasonable. Mr. Chapman testified that Vectren proposed this alternative to minimize the immediate rate impact on customers. Vectren is currently recovering fuel costs that had been previously deferred and will continue doing so until 2020. Mr. Chapman said that the proposal in this case to defer the Mandated Projects Costs until 2020 is timed to allow recovery of the previously deferred

fuel costs to end before recovery of the deferred Mandated-Projects-Related costs….

Based on the evidence presented, we approve Vectren's proposal to create a regulatory asset to reflect the deferral of the Mandated Project Costs….Vectren has not specified the particular method or therms [sic] by which it will ultimately recover the deferred Mandated Projects Costs in rates; therefore, before beginning recovery of the deferred costs, it must file a case setting forth the specific recovery mechanism and terms or seek recovery of the deferred costs in its next base rates case.

**C. Deferred Recovery under Ind. Code ch. 8-1-8.8**. Under Ind. Code § 8-1-8.8-11(a)(5), the Commission can authorize other financial incentives that it considers appropriate for clean energy projects only if the projects are found to be reasonable and necessary.

Vectren submitted evidence showing that failure to comply with the federally mandated requirements would require Vectren to retire Brown, Culley, and Warrick, which make up approximately 85% of its baseload generation, in 2015. The Mandated Projects will enable the continued operation of the facilities for at least the next ten years and continued service to Vectren's customers.

Vectren evaluated several alternative compliance technologies that would allow the Brown, Culley, and Warrick units to comply with pollution limits established in the MATS rule, NOV, and NPDES….

Vectren hired Black & Veatch to further evaluate the most promising technologies and consider alternatives for bringing its generation fleet in compliance with federal regulations….

Vectren jointly owns Warrick unit 4 with Alcoa….Alcoa engaged Burns & McDonnell to evaluate technologies. Burns & McDonnell ranked the technologies in order of cost estimate related to capital investment and ongoing O&M. Alcoa selected the option with the lowest cost that was able to achieve MATS compliance.

Vectren also considered whether the continued operation of Brown units 1 and 2, Culley unit 3, and Warrick unit 4 was the best option. Vectren submitted production cost modeling supporting its plan to continue investing in, rather than retire, Brown, Culley, and Warrick. Specifically, Vectren presented a ten-year production cost model using PROMOD IV prepared by Black & Veatch. Vectren also engaged Burns & McDonnell to conduct an analysis over a 20-year period to respond to concerns by the Joint Intervenors and OUCC.

The evidence presented by Vectren shows that failure to complete the Mandated Projects could require the premature retirement of the related generation facilities, which would result in significant reliability, market, and regulatory risk. MISO is projecting capacity shortfalls as early as 2016 and constructing a new gas generation facility would take at least four years. Without the ability to obtain voltage support from distant generators to serve its territory, Vectren would be forced to purchase capacity in an already constrained market. All of these factors point to concerns that retirement of Brown and Culley would expose Vectren's customers to significant reliability risks. Based on the evidence presented, we find that the Mandated Projects are reasonable and necessary.

**D. Cost Estimate**. Vectren estimated the Mandated Projects Costs to be in the range of $75-$95 million. Black & Veatch estimated the cost of the EPCM contract using techniques that rendered it a Class 2 estimated pursuant to the Association for the Advancement of Cost Engineering. A Class 2 Estimate has an accuracy of -5% to -15% on the low end and +5% to +20% on the high end. No party disputed the estimated costs.

The evidence presented sufficiently describes the Mandated Project Costs and demonstrates that the components of the Mandated Projects offer substantial potential to cost-effectively reduce pollutants. Based on our review of the evidence, we approve Vectren's cost estimates for the Mandated Projects.

****

It is therefore ordered by the Indiana Utility Regulatory Commission that:

1. The Mandated Projects are "clean energy projects" and "clean coal technology" under Ind. Code 8-1-8.8.

2. The MATS rule, NOV, and NPDES limits are federally mandated requirements as defined by Ind. Code § 8-1-8.4-5.

3. The Mandated Projects are federally mandated "compliance projects" under Ind. Code § 8-1-8.4-2 and the costs incurred in connection with the "Mandated Projects are "federally mandated costs" under Ind. Code § 8-1-8.4-4.

4. The cost estimate provided by Vectren in this Cause for the Mandated Projects is approved….

5. Vectren is authorized to record the deferred Mandated Projects Costs as a regulatory asset until the date of a Commission order authorizing recovery of the deferred Mandated Projects Costs in Petitioner's recoverable operating expenses.

Appellants' App. pp. 19-23.

# Discussion and Decision

[11] On appeal, Appellants argue that the Commission erred by failing to make findings of fact on issues which Appellants believe were material to the Commission's ultimate determination; specifically, whether upgrading Culley unit 2 is needed in light of future electricity load estimates and whether Vectren's delay in filing its petition was unreasonable. Appellants also argue that the Commission was statutorily required to make findings on the specific factors listed in Indiana Code section 8-1-8.7-3. Vectren argues that the Appellants' claims are moot because Appellants failed to obtain a stay pending

appeal and Vectren have since completed and began using many of the Mandated Projects.

# I. Standard of Review

[12] "The General Assembly created the Indiana Utility Regulatory Commission primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *N. Ind. Pub. Serv. Co. v. United States Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission's goal is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Id.* An order from the Commission is presumed valid unless the contrary is clearly apparent. *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 612 (Ind. 1985).

[13] The standard for our review of decisions of the Commission is governed by Indiana Code section 8-1-3-1:

> An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

[14] The Indiana Supreme Court has interpreted this statute to provide a tiered standard of review.

> A multiple-tier standard of review is applicable to the IURC's orders. A court on review must inquire whether specific findings exist as to all factual determinations material to the ultimate conclusions; whether substantial evidence within the record as a

whole supports the findings of fact; and whether the decision, ruling, or order is contrary to law.

*Citizens Action Coal. of Ind., Inc. v. Pub. Serv. Co. of Ind.*, 612 N.E.2d 199, 201 (Ind. Ct. App. 1993) (citations omitted). "On matters within its jurisdiction, the Commission enjoys wide discretion. The Commission's findings and decision will not be lightly overridden just because we might reach a contrary opinion on the same evidence." *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 31 N.E.3d 1, 5-6 (Ind. Ct. App. 2015).

# II. Mootness

As a threshold issue, Vectren argues that the Appellants' contentions on appeal are moot. "An appeal is moot when it is no longer live and the parties lack a legally cognizable interest in the outcome or when no effective relief can be rendered to the parties." *Union Twp. Sch. Corp. v. State ex rel. Joyce*, 706 N.E.2d 183, 187 (Ind. Ct. App. 1998) (citing *City of Huntingburg v. Phoenix Natural Resources, Inc.*, 625 N.E.2d 472, 474 (Ind. Ct. App. 1993)). Specifically, Vectren claims that the projects "have been substantially completed and in use since the start of 2015" and that because Appellants did not seek a stay preventing Vectren's use of its new environmental controls, this court is unable to grant effective relief without forcing Vectren to shut down its power plants, which Vectren claims would run counter to public policy of maintaining reliable energy security. Vectren's Br. p. 17.

[16] Vectren attempts to analogize this case to two annexation cases in which this court held that unless a trial court's approval of an annexation is stayed, the appellant-remonstrators have no recourse on appeal. *Annexation Ordinance F-2008-15 v. City of Evansville*, 955 N.E.2d 769, 777 (Ind. Ct. App. 2011); *Certain Martinsville Annexation Territory Landowners v. City of Martinsville*, 18 N.E.3d 1030, 1034 (Ind. Ct. App. 2014) *trans. denied*. As we explained in those cases, the Indiana legislature has provided "the exclusive means to disannex…municipal boundaries in Indiana Code sections 36-4-3-16 through 36-4-3-20," and that, under those sections, Indiana courts are only permitted to order disannexation under one circumstance: when the municipality has failed to implement planned services according to statute. *Annexation Ordinance F-2008-15*, 955 N.E.2d at 777-78. Accordingly, barring the single statutory exception, our courts cannot grant effective relief to appellants who do not seek a stay of annexation because we lack the authority to do so.

[17] Appellants analogize this case to *Columbus Board of Zoning Appeals v. Wetherald*, which dealt with Wetherald's petition for zoning variances. 605 N.E.2d 208 (Ind. Ct. App. 1992). Wetherald was the owner of a lot on which he planned to construct a drive-through restaurant. *Id*. at 209. In 1991, Wetherald applied for developmental variances with the Columbus Board of Zoning Appeals ("BZA") in order to qualify for a building permit to make improvements to his lot necessary for his restaurant. *Id*. at 210. The BZA denied the application and Wetherhald appealed to the trial court which reversed the BZA and granted the variances. The BZA appealed but failed to obtain a stay pending appeal and,

while the appeal was pending, Wetherhald obtained a building permit based on the trial court's ruling, constructed the restaurant, and opened for business. *Id.* On appeal, this court found as follows:

> Here, contrary to Wetherald's contention, the appeal is not moot. If relief were granted to the BZA reversing the trial court's grant of the Variances, then the BZA's decision denying the Variances would be reinstated. Wetherald would then be required to bring the Restaurant into compliance with the regular developmental standards, including removing structures already completed. We cannot sanction Wetherald's construction pending appeal as creating mootness; otherwise, those seeking variances for construction purposes could circumvent zoning requirements by simply constructing in accordance with permits issued, although final resolution of the propriety of such variances was still pending on appeal. Wetherald proceeded to build at his own peril prior to a final resolution of the variance issues.

*Id.*

[18] The facts of the instant case are more akin to the *Wetherhald*. As in *Wetherhald*, Vectren began work on the Mandated Projects while the appeal was pending at its own risk. If we adopt Vectren's logic on this issue, then many appellants would be required to request a stay of judgment in order to preserve their right to appeal. The purpose of a stay is to preserve the status quo while an appeal is pending, it is not intended to be a prerequisite to an appeal. *Flynn v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995). Vectren cannot singlehandedly prevent Appellants' ability to pursue an appeal by building the environmental controls at issue while the appeal is pending and then claim that the appeal is moot because they have already built those controls.

Furthermore, it is within this court's power to grant the relief sought by Appellants; that is, remand with instructions that the Commission make additional findings. "In the event a stay is not sought, the prevailing party is free to take advantage of the district court's judgment. And as long as the prevailing party's actions pending the appeal do not render it impossible to fashion some form of relief to the appellant, then there remains a case or controversy within the scope of Article III." *Id.* With the forgoing in mind, we find that Appellants' claims are not moot.

# III. Overview of the Relevant Indiana Utility and Clean Coal Technology Statutes

Vectren petitioned the Commission for a CPCN approving of the Mandated Projects under Indiana Code chapters 8-1-8.4 ("Chapter 8.4") and 8-1-8.7 ("Chapter 8.7"). Vectren also applied for financial incentives under Indiana Code chapter 8-1-8.8 ("Chapter 8.8") and, alternatively, to recover federally mandated costs under Indiana Code section 8-1-8.4-7.

### A. Indiana Code Chapter 8.7

Indiana Code section 8-1-8.7-3 provides as follows:

> (a) Except as provided in subsection (c), a public utility may not use clean coal technology at a new or existing electric generating facility without first applying for and obtaining from the commission a certificate that states that public convenience and necessity will be served by the use of clean coal technology.
>
> (b) The commission shall issue a certificate of public convenience and necessity under subsection (a) if the commission finds that a

clean coal technology project offers substantial potential of reducing sulfur or nitrogen based pollutants in a more efficient manner than conventional technologies in general use as of January 1, 1989....

When determining whether to grant a certificate under this section, the commission shall make findings on nine factors: (1) the costs of constructing, implementing, and using the CCT project compared to the costs of conventional emission reduction facilities, (2) whether a CCT project will extend the useful life of an existing electric generating facility and the value of that extension, (3) the potential reduction of sulfur and nitrogen based pollutants achieved by the proposal, (4) the reduction of pollutants that can be achieved by conventional pollution control equipment, (5) federal sulfur and nitrogen emission standards, (6) the likelihood of success of the project, (7) the cost and feasibility of the retirement of an existing electric generating facility, (8) the dispatching priority for the facility utilizing CCT, and (9) any other factors the commission considers relevant, including whether the construction, implementation, and use of clean coal technology is in the public's interest. Ind. Code § 8-1-8.7-3(b).

[22]     Indiana Code section 8-1-8.7-4 provides that

> (a) As a condition for receiving the certificate required under [Section 8-1-8.7-3], an applicant must file an estimate of the cost of constructing, implementing, and using clean coal technology and supportive technical information in as much detail as the commission requires.

(b) The commission shall hold a public hearing on each application. A certificate shall be granted only if the commission has:

> (1) made a finding that the public convenience and necessity will be served by the construction, implementation, and use of clean coal technology;
>
> (2) approved the estimated costs;
>
> (3) made a finding that the facility where the clean coal technology is employed:
>
>> (A) utilizes and will continue to utilize Indiana coal as its primary fuel source; or
>>
>> (B) is justified, because of economic considerations or governmental requirements, in utilizing non-Indiana coal;
>
> (4) *made a finding on each of the factors described in section 3(b) of this chapter*, including the dispatching priority of the facility to the utility.

(emphasis added).

### B. Indiana Code Chapter 8.4

[23]    Indiana Code section 8-1-8.4-6 provides, in relevant part, as follows:

> (a) Except as provided in subsection (c), or unless an energy utility has elected to file for:
> (1) a certificate of public convenience and necessity; or
> (2) the recovery of costs;
> under another statute, an energy utility that seeks to recover federally mandated costs under section 7(c) of this chapter must obtain from the commission a certificate that states that public convenience and necessity will be served by a compliance project proposed by the energy utility.

(b) The commission shall issue a certificate of public convenience and necessity under section 7(b) of this chapter if the commission finds that the proposed compliance project will allow the energy utility to comply directly or indirectly with one (1) or more federally mandated requirements.

In determining whether to grant a certificate under Section 8-1-8.4-6, the Commission must examine several statutory factors, including the federally mandated requirements sought to be complied with, project costs, how the proposed projects will meet federal requirements, "alternative plans that demonstrate that the proposed compliance project is reasonable and necessary," whether the project will extend the useful life of an existing energy facility and the value of such extension, and any other factors the Commission considers relevant. Ind. Code § 8-1-8.4-6(b).

[24] Indiana Code section 8-1-8.4-7 provides that

> (b) The commission shall hold a properly noticed public hearing on each application and grant a certificate only if the commission has:
> (1) made a finding that the public convenience and necessity will be served by the proposed compliance project;
> (2) approved the projected federally mandated costs associated with the proposed compliance project; and
> (3) made a finding on each of the factors set forth in section 6(b) of this chapter.
>
> (c) If the commission approves under subsection (b) a proposed compliance project and the projected federally mandated costs associated with the proposed compliance project, the following apply:
> (1) Eighty percent (80%) of the approved federally mandated costs shall be recovered by the energy utility through a periodic

retail rate adjustment mechanism that allows the timely recovery of the approved federally mandated costs….

(2) Twenty percent (20%) of the approved federally mandated costs, including depreciation, allowance for funds used during construction, and post in service carrying costs, based on the overall cost of capital most recently approved by the commission, shall be deferred and recovered by the energy utility as part of the next general rate case filed by the energy utility with the commission.

(3) Actual costs that exceed the projected federally mandated costs of the approved compliance project by more than twenty-five percent (25%) shall require specific justification by the energy utility and specific approval by the commission before being authorized in the next general rate case filed by the energy utility with the commission.

### C. Indiana Code Chapter 8.8

[25] Indiana Code section 8-1-8.8-11(a) provides that "[t]he commission shall encourage clean energy projects by creating…financial incentives for clean energy projects, if the projects are found to be reasonable and necessary," including "recovery of costs and expenses incurred during construction and operation of [CCT] projects…."

# IV. Whether the Commission Complied with Requirements of Indiana Code Section 8-1-8.7-3

[26] According to Indiana Code section 8-1-8.7-3, "a public utility may not use clean coal technology…without first applying for and obtaining from the commission a certificate that states that public convenience and necessity will be served by the use of clean coal technology." In order to grant a CPCN under Section 8-1-8.7-3, the Commission must make findings on nine factors listed in the Section

8-1-8.7-3(b). Appellants claim that the Commission erred by failing to make findings on those factors. Appellees do not dispute that the Commission did not make specific findings on the statutory factors, however, Appellees claim that the Commission based its decision only on Chapters 8.4 and 8.8, and so was not subject to the requirements of Chapter 8.7, as the Appellants claim.

[27] We first note that basing its decision off of Chapter 8.8 would not relieve the Commission or Vectren of the requirements of Chapter 8.7. Indiana Code section 8-1-8.8-11(b) provides as follows:

> An eligible business must file an application to the commission for approval of a clean energy project under this section. *This chapter does not relieve an eligible business of the duty to obtain any certificate required under…IC 8-1-8.7.* An eligible business seeking a certificate under…IC 8-1-8.7 and this chapter for one (1) project may file a single application for all necessary certificates. If a single application is filed, the commission shall consider all necessary certificates at the same time.

(Emphasis added). Therefore, a finding that the projects were reasonable and necessary under Chapter 8.8 does not change the fact that Vectren was required to obtain a CPCN before using new CCT and that the Commission was required to make findings under Chapter 8.7 before granting a CPCN thereunder. Accordingly, the questions we address here are (1) whether Vectren's projects qualified as CCT sufficient to require a CPCN under Chapter 8.7, and (2) if so, whether the Commission effectively issued a CPCN to Vectren.

# A. Defining Clean Coal Technology

[28] Appellees argue that Chapter 8.7 applies to CCT that reduces *only* "airborne emissions of sulfur or nitrogen based pollutants" and so does not apply to their projects, which are designed to reduce sulfur, nitrogen, *and* mercury. Ind. Code § 8-1-8.7-1. Appellants cite to a previous decision by the Commission for support of this interpretation of the statute. The Commission found that "[c]lean coal technology under Ind. Code § 8-1-8.7-1 is limited technology that reduces only sulfur or nitrogen based pollutants." *In re Indpls. Power & Light Co.*, 307 P.U.R.4th 311 (Ind. U.R.C. Aug. 14, 2013). For their part, Appellants argue that because Vectren's proposal distinguishes which emission controls address sulfur and which address mercury, Vectren was required to obtain a CPCN under Chapter 8.7 for those controls addressing sulfur emissions.

[29] The Commission found that "the Brown and Culley Air Projects and Warrick Project all constitute CCT as defined by Ind. Code § 8-1-8.8-3." Appellants' App. p. 17. Section 8-1-8.8-3 defines CCT as "a technology…that…reduces airborne emissions of sulfur, *mercury*, or nitrogen oxides or other regulated air emissions associated with the combustion of coal…." (emphasis added). This definition applies only to Chapter 8.8. The definition of CCT in Section 8-1-

8.7-1 applies only to technologies which reduce emissions of sulfur or nitrogen based pollutants. This definition applies only to Chapter 8.7.[4]

[30] As outlined in Vectren's proposal, the organo-sulfide and hydrogen bromide injection systems are designed to mitigate mercury emissions, while the soda ash and hydrated lime injection systems address only sulfur emissions. As such, the latter undoubtedly falls under Chapter 8.7's definition of CCT.[5] Therefore, Vectren requires a CPCN to use the two injection systems designed to mitigate sulfur emissions. However, the systems concerning mercury emissions are not considered CCT projects for purposes of Chapter 8.7 because they do not "reduce airborne emissions of sulfur or nitrogen based pollutants." Ind. Code § 8-1-8.7-1. As such, those mercury mitigation systems do not require a CPCN issued under Chapter 8.7 as a prerequisite to their use.

## B. CPCN Under Chapter 8.4

[31] Vectren argues that even if a CPCN is required in order to use its CCT projects under Chapter 8.7, Chapter 8.7 does not require that the CPCN approving of the CCT project be granted under that section specifically. "[A] public utility

---

[4] The definition of CCT used in Chapter 8.7 was adopted in 1989 while the definition used in Chapter 8.8 was enacted along with several 2002 amendments to the Indiana utilities code. It is unclear why the legislature would draw a distinction between the definitions of CCT in these two chapters, however, the definitions apply only to their respective chapters so there is no conflict which would necessitate a statutory interpretation by this court.

[5] We note that this finding is consistent with Vectren's own position below. Vectren's petition sought "approval of clean coal technology" pursuant to Sections 8-1-8.7-1 *et seq.*, 8-1-8.4-1 *et seq.*, and 8-1-8.8-1 *et seq.* In other words, it appears that, despite the position Vectren has taken on appeal, Vectren believed that at least some of its projects qualified as CCT under Chapter 8.7.

may not use clean coal technology at a new or existing electric generating facility without first applying for and obtaining from the commission a certificate that states that public convenience and necessity will be served by the use of clean coal technology." Ind. Code § 8-1-8.7-3. Specifically, Vectren claims that a CPCN granted under the following provision in Chapter 8.4 would be sufficient to satisfy the CPCN requirement of Chapter 8.7: "[A]n energy utility that seeks to recover federally mandated costs under section 7(c) of this chapter must obtain from the commission a certificate that states that public convenience and necessity will be served by a compliance project proposed by the energy utility." Ind. Code § 8-1-8.4-6.

[32] Chapters 8.4 and 8.7 have different requirements in order to issue CPCNs thereunder. Section 8-1-8.7-3(b) provides that

> When determining whether to grant a certificate under this section, the commission shall examine the following factors:
>
> (1) The costs for constructing, implementing, and using clean coal technology compared to the costs for conventional emission reduction facilities.
>
> (2) Whether a clean coal technology project will also extend the useful life of an existing electric generating facility and the value of that extension.
>
> (3) The potential reduction of sulfur and nitrogen based pollutants achieved by the proposed clean coal technology system.
>
> (4) The reduction of sulfur nitrogen based pollutants that can be achieved by conventional pollution control equipment.
>
> (5) Federal sulfur and nitrogen based pollutant emission standards.

(6) The likelihood of success of the proposed project.

(7) The cost and feasibility of the retirement of an existing electric generating facility.

(8) The dispatching priority for the facility utilizing clean coal technology, considering direct fuel costs, revenues and expenses of the utility, and environmental factors associated with byproducts resulting from the utilization of the clean coal technology.

(9) Any other factors the commission considers relevant, including whether the construction, implementation, and use of clean coal technology is in the public's interest.

[33]     Section 8-1-8.4-6(b) provides as follows:

The commission shall issue a certificate of public convenience and necessity under section 7(b) of this chapter if the commission finds that the proposed compliance project will allow the energy utility to comply directly or indirectly with one (1) or more federally mandated requirements.

In determining whether to grant a certificate under Indiana Code section 8-1-8.4-6, the Commission *must* make findings on several statutory factors, including the federally mandated requirements sought to be complied with, project costs, how the proposed projects will meet federal requirements, "alternative plans that demonstrate that the proposed compliance project is reasonable and necessary," whether the project will extend the useful life of an existing energy facility and the value of such extension, and any other factors the Commission considers relevant.  Ind. Code §§ 8-1-8.4-6(b), 8-1-8.4-7.

[34] We conclude that a CPCN granted under Chapter 8.4 would not be sufficient to satisfy the CPCN requirement of Chapter 8.7. First, the two Chapters serve different purposes: Chapter 8.4 requires the issuance of a CPCN in order to recover costs of a federally-mandated compliance project, whereas Chapter 8.7 requires the issuance of a CPCN to approve of a CCT project. These two chapters have different factor analyses, and presumably, these factors are appropriate to their respective purposes. Additionally, Section 8-1-8.4-6(a) states that an energy utility is not required to obtain a CPCN under Section 8-1-8.4-6 if it obtains a CPCN under another statute, whereas Chapter 8.7 contains no such provision.

[35] Furthermore, as Vectren notes in its brief, a certificate of public convenience and necessity "is not an independent document; it is simply a phrase that may appear in a Commission order…. The Commission was not required to use those 'magic words' in its ordering language to provide such relief." Vectren's Br. p. 21 fn. 13 (citing *Jennings Water, Inc. v. Office of Envtl. Adjudication*, 909 N.E.2d 1020, 1024 (Ind. Ct. App. 2009) ("This Court has held in many different contexts that no "magic words" are required so long as there is enough evidence to support the judgment or conclusion.")). This logic reflects the importance of conducting the proper analysis over simply saying the 'magic words.' As such, even if the Commission did issue a CPCN under Chapter 8.4, those 'magic words' do not work to circumvent the analysis required by Chapter 8.7.

[36] Even if we assume Vectren's interpretation of the statutes is correct, and a CPCN issued solely under Chapter 8.4 is sufficient to satisfy the requirements of Chapter 8.7, the Commission did not issue a CPCN under Chapter 8.4. Vectren argues that the Commission "could have issued (and effectively did issue) a [CPCN] under Chapter 8.4." Vectren's Br. p. 21. However, the Commission itself acknowledges in its brief that it did not issue a CPCN.

> Under Ind. Code § 8-1-8.4-6(a), a CPCN is required "unless an energy utility has elected to file for…the recovery of costs under another statute." In this proceeding, the recovery of costs and financial incentives were approved by the Commission under another statute, specifically Ind. Code § 8-1-8.8-11(a), in the form of the creation of a regulatory asset to reflect the deferral of the costs of the Mandated Projects. Because the cost recovery approved was under another statute (i.e., other than Chapter 8.4), the issuance of a CPCN by the Commission was not statutorily required by Chapter 8.4.

Commission's Br. pp. 8-9.

[37] Vectren may not use CCT (as defined in Chapter 8.7) until the Commission issues them a CPCN under Indiana Code section 8-1-8.7-3. On remand, the Commission shall make findings on the factors listed in Section 8-1-8.7-3(b) regarding the soda ash and hydrated lime injection systems which qualify as CCT under Chapter 8.7 and, based on those findings, determine whether those systems serve public convenience and necessity.

# C. Whether the Commission's Failure to Make Findings Under Indiana Code Section 8-1-8.7-3 was Harmless or *de miminis* Error

[38] Vectren argues that even if the Commission did err in failing to consider the Indiana Code section 8-1-8.7-3 factors, that error is either *de minimis* or harmless because the Commission would have reached the same result and issued a CPCN under Chapter 8.7 if it had made the appropriate findings on the Section 8-1-8.7-3(b) factors. Vectren's argument is attractive at first blush. The Commission heard evidence concerning most of the issues which the 8-1-8.7-3(b) factors address. Unfortunately, the Commission was required to make findings on specific factors and grant or deny a CPCN based on those findings, neither of which it did.

[39] In some cases, we have found that "a trial court's exclusion of [statutory] factors from its written findings does not mean that it did not consider them," *Shumaker v. Shumaker*, 559 N.E.2d 315, 318 (Ind. Ct. App. 1990), and that any such error by an exclusion of factors may be harmless when the trial court otherwise satisfies the requirements of the statute. *Helm v. Helm*, 873 N.E.2d 83, 90 (Ind. Ct. App. 2007). Here however, the Commission did not mention Chapter 8.7 in its order and maintains on appeal that Chapter 8.7 does not apply and that it "did not make any Chapter 8.7 findings." Commission's Br. p. 9. As we have already found, Chapter 8.7 does apply to certain projects within Vectren's proposal. Accordingly, it was not harmless error for the Commission to ignore the statutory factors outlined in Section 8-1-8.7-3(b).

# V. Whether the Commission Erred in Failing to Make Findings Regarding the Necessity of Culley Unit 2

[40]   Appellants claim that "The Commission made no finding that Culley Unit 2, or any other unit, is necessary for meeting the electricity needs of Vectren's customers." Appellants' Br. p. 20. Appellants allege that, based on load forecasts, Culley unit 2 will not be needed to meet consumer electricity demand and so it is not reasonable and necessary for purposes of the clean energy statutes. Consequently, Appellants argue that whether Culley unit 2 was necessary considering load forecasts was material to the Commission's ultimate conclusion and that the Commission erred in failing to make findings on this issue. We find Appellants argument on this issue unconvincing for two reasons.

[41]   First, the Commission specifically addressed the issue of electricity demand when it found that retiring the Brown or Culley facilities prematurely would result in reliability risks for consumers based on capacity shortfall projections.

> Vectren also considered whether the continued operation of Brown units 1 and 2, Culley unit 3, and Warrick unit 4 was the best option. Vectren submitted production cost modeling supporting its plan to continue investing in, rather than retire, Brown, Culley, and Warrick….
>
> The evidence presented by Vectren shows that failure to complete the Mandated Projects could require the premature retirement of the related generation facilities, which would result in significant reliability, market, and regulatory risk. MISO is projecting capacity shortfalls as early as 2016 and constructing a new gas generation facility would take at least four years. Without the

ability to obtain voltage support from distant generators to serve its territory, Vectren would be forced to purchase capacity in an already constrained market. All of these factors point to concerns that retirement of Brown and Culley would expose Vectren's customers to significant reliability risks. Based on the evidence presented, we find that the Mandated Projects are reasonable and necessary.

Appellant's App. p. 21.

[42] Furthermore, Vectren did not request the approval of any project tied *only* to Culley unit 2 because it was not a non-compliant unit and so was not at issue in these proceedings. As the Commission noted in its order, "Culley unit 2 was not evaluated because Vectren was not seeking relief for work done on that unit and it was not part of Vectren's settlement with the EPA." Appellant's App. p. 16. The only portion of the Culley Air project which would affect Culley 2 is the organo-sulfide injection system which would be installed at the "*combined* scrubber" which serves both Culley units 2 and 3. Appellants' App. p. 10 (emphasis added). In other words, the emissions control being added by the project will improve an existing emissions control which currently serves both Culley units. The project is designed to bring Culley unit 3 into compliance and would have only an ancillary effect on Culley unit 2. Therefore, the Commission did not fail to make necessary findings on this issue.

## VI. Whether the Commission Erred in Failing to Make Findings on Vectren's Delay in Filing its Application

[43] Appellants claim that Vectren unreasonably delayed in filing its application for the Mandated Projects and that that delay resulted in the reliability risks which

Vectren has used to justify its proposal. Appellants further argue that the trial court erred in failing to make findings on this issue. This argument is without merit. Appellants claim, without any supporting evidence, that Vectren's delay was unreasonable because "Vectren could have filed its application in 2012 or at the latest in 2013, when the MATS and NPDES obligations were known to the utility, and when the utility was aware of EPA's notice of sulfur trioxide emission violations." Appellants' Br. p. 21.

[44] The only information in the record which Appellants cite to support Appellants' contention of unreasonable delay is the testimony of Vectren Vice President Angila Retherford which shows that Vectren received the initial NOV regarding the Brown facility in November of 2011. However, Retherford went on to testify that Vectren disputed the allegations raised in the NOV and that it was not until August of 2013 that EPA inspectors visited the Brown and Culley facilities to gather visible emissions readings. The EPA's inspections revealed opacity at both plants over permitted limits resulting from sulfur trioxide emissions and requested that Vectren address the issue.

[45] Apparently, Appellants argument is that the time between Vectren's being put on notice of its noncompliance and Vectren's filing of the instant petition is inherently unreasonable. Vectren filed the instant petition in January of 2014. In the time after receipt of the NOV and before filing the petition, Vectren was negotiating a settlement with the EPA and engaging consultants to determine the best method of compliance. Appellants cite no evidence to support their argument that Vectren's disputing the NOVs was done with the intent to reduce

the feasibility of alternative compliance options. Therefore, we find that the Commission did not err in failing make findings on this issue as it does not appear from the record that it was material to the Commission's ultimate conclusions.

# Conclusions

[46] We find that (1) the Appellants' claims are not moot, (2) the Commission did not err in failing to consider the necessity of Culley unit 2 or the reasonableness of Vectren's delay in filing its petition, and (3) regarding the soda ash and hydrated lime injection systems, the Commission erred by failing to make findings on the statutory factors listed in Indiana Code section 8-1-8.7-3 and by failing to grant or deny Vectren's request for a CPCN thereunder. Accordingly, we remand the case to the Commission with instructions that the Commission make the required findings under Chapter 8.7.

[47] Remanded with instructions.

May, J., and Crone, J., concur.