**FILED**

Feb 14 2017, 9:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Thomas Cmar
Oak Park, Illinois

Matthew Gerhart
Denver, Colorado

Jennifer A. Washburn
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

David Lee Steiner
Deputy Attorney General
Indianapolis, Indiana

Beth Krogel Roads
Jeremy R. Comeau
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

Robert E. Heidorn
P. Jason Stephenson
Evansville, Indiana

Wayne C. Turner
Patrick A. Ziepolt
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Citizens Action Coalition of
Indiana, Inc., Sierra Club, Inc.,
Valley Watch, Inc.,

*Appellants-Intervenors,*

v.

Southern Indiana Gas and
Electricity Company d/b/a
Vectren Energy Delivery of
Indiana, Inc., Indiana Office of
Utility Consumer Counselor,

*Appellees-Petitioners*

February 14, 2017

Court of Appeals Case No.
93A02-1607-EX-1637

Appeal from the Indiana Utility
Regulatory Commission

The Honorable Jeffery A. Earl,
Administrative Law Judge

The Honorable Carol A. Stephan,
Commissioner Chair

The Honorable Angela Weber,
Commissioner

The Honorable David Ziegner,
Commissioner

The Honorable James Huston,
Commissioner

Trial Court Cause No.
44446

**Altice, Judge.**

## Case Summary

Over three years ago, Southern Indiana Gas and Electric Company d/b/a
Vectren Energy Delivery of Indiana, Inc. (Vectren) petitioned the Indiana
Utility Regulatory Commission (IURC) for approval of projects to modify four
of Vectren's coal-powered generating stations to bring them into compliance
with EPA emissions standards. Citizens Action Coalition of Indiana, Inc.,
Sierra Club, Inc., and Valley Watch, Inc. (collectively, Intervenors) intervened
in the action and opposed the petition.

[2]     The IURC ultimately approved the petition, determining that Vectren's proposed projects were reasonable and necessary under Ind. Code § 8-1-8.8-11. Upon Intervenors' appeal in *Citizens Action Coal. of Ind., Inc. v. S. Ind. Gas & Elec. Co.* (*Vectren I*), 45 N.E.3d 483 (Ind. Ct. App. 2015), another panel of this court remanded with respect to two of the proposed projects, finding that I.C. § 8-1-8.7-3 rather than I.C. § 8-1-8.8-11 applied. This court instructed the IURC to make findings regarding the statutory factors listed in I.C. § 8-1-8.7-3 and then issue or deny a certificate of public convenience and necessity (CPCN) for the two projects.

[3]     On remand, the IURC refused a request by Intervenors to reopen the record to consider new evidence. It also issued an order analyzing the nine statutory factors, concluding that public convenience and necessity will be served by the proposed clean coal technology projects, and issuing a CPCN to Vectren for the remaining projects. Intervenors appeal once again. They argue that the IURC's findings are not adequately explained, are arbitrary and capricious, and are not supported by substantial evidence. Additionally, Intervenors argue that the IURC unlawfully denied the petition to reopen the record.

[4]     We affirm.[1]

---

[1] By separate order issued today, we grant Intervenors' motion to dismiss the IURC as a party to this appeal. We agree that because the IURC acted as a fact-finding administrative tribunal and no statute or administrative provision expressly makes the IURC a party on appeal, it is not a proper party on appeal from its own decision. *See City of Terre Haute v. Terre Haute Water Works Corp.*, 180 N.E.2d 110, 111 (Ind. Ct. App. 1962) ("When there are two opposing parties before [the Public Service Commission of Indiana], as here, its action in making findings and issuing an order deemed detrimental by one of the parties is similar to that of a

Vectren is a public utility company that provides electricity to southern Indiana residents. Eighty-five percent of Vectren's baseload electricity is generated at Brown unit 1, Brown unit 2, Culley unit 2, Culley unit 3, and Warrick, all of which are coal-powered generators. In 2012, the EPA issued a Notice of Violation (NOV) alleging that Vectren's emissions control technology at its Brown units was noncompliant with EPA rules governing sulfuric acid emissions. The EPA also served Vectren with a Clean Air Act Information Request that highlighted concerns with the sulfur emissions at Culley unit 3. Vectren and the EPA eventually reached a settlement in principle to resolve the outstanding allegations raised in the NOV and the information request. Vectren also became subject to new federal mandates regarding mercury emissions standards.

On January 17, 2014, as a result of the compliance issues, Vectren filed a petition with the IURC for approval of modifications to four of its coal-powered electricity generating facilities – Brown units 1 and 2, Culley unit 3, and Warrick. The petition sought approval of several clean energy projects and

---

court which makes a decision determining a controversy between adverse parties. A court is never a party to an appeal from its decision."); *Cf.* Ind. Code § 22-4-17-12(b) (expressly making the Review Board of the Indiana Department of Workforce Development a party appellee in every appeal of the review board's decision).

[2] We rely on many of the facts set out in *Vectren I*.

issuance of a CPCN to construct, install, and use clean coal technology (CCT).[3] Among other projects,[4] Vectren requested approval for a soda ash injection system for sulfur trioxide ($SO_3$) mitigation at Brown units 1 and 2 and a hydrated lime injection system for $SO_3$ mitigation at Culley unit 3.

[7]    In April 2014, Intervenors intervened in the IURC proceedings and opposed Vectren's petition.[5]  Intervenors contended that Vectren should replace all or some of the units with new electricity-generating sources (such as, natural gas, wind, or solar) instead of retrofitting the existing coal units.  According to Intervenors, this would be more cost-effective for Vectren's customers over the long run.

[8]    The dispute between Vectren and Intervenors became a battle of experts. Vectren hired the engineering firm Black & Veatch (B & V) to compare the total ratepayer cost and relative risk of the proposed modifications versus the cost and risks associated with retiring and replacing the noncompliant units.

> B & V's report found that the only feasible plans to meet
> environmental regulations were (1) replacing one or more of

---

[3] Vectren also requested approval of certain financial incentives and approval to defer project costs, including depreciation and operations and maintenance expenses, for a period up to December 31, 2020.  Approval of these financial requests is not at issue in this appeal.

[4] The other projects addressed mercury emissions.  Although the IURC's approval of these projects was at issue in *Vectren I*, it is not here.

[5] The Indiana Office of Utility Consumer Counselor (OUCC) initially opposed Vectren's petition also.  After reviewing additional information provided by Vectren, the OUCC eventually withdrew its opposition.  The OUCC indicated to the IURC that it believed the proposed projects were appropriate and that it would support approval of all projects if the IURC determined that the modeling assumptions and analyses showed that the plan was reasonable.

Vectren's current units with new natural gas-powered facilities and retiring the remaining facilities, or (2) upgrading the current coal-powered facilities. B & V evaluated twenty-one potential scenarios involving various gas-powered replacement options and a range of potential market and environmental scenarios. B & V concluded that of the twenty-one scenarios, only one offered a small savings over the Mandated Projects proposal. B & V found that the cost savings under this one scenario were "marginal" and conditional on a future market scenario with low natural gas prices and high carbon prices. Accordingly, B & V concluded that Vectren's plan to modify the existing facilities was the best option in terms of cost to ratepayers.

*Id*. at 487 (record cite omitted).

[9] Intervenors submitted testimony of their expert, Dr. Jeremy I. Fisher, who felt that the 10-year period used in B & V's analysis was too short to capture accurate long-term costs and risks associated with the proposal and that using a 20-year model would be more appropriate. Dr. Fisher maintained that, under a 20-year analysis, natural gas-powered generators would be more cost efficient. He also noted other errors he believed B & V committed in its economic modeling, including the exclusion of wholesale capacity and energy sales.

[10] Vectren's President and CEO, Carl L. Chapman, disagreed that Vectren should retire 85% of its generation facilities and opined that this was a riskier approach. He testified that capacity constraints, market conditions, and economic growth would create tremendous risk. He also noted that there would be significant costs left undepreciated from prior investments in the units (stranded costs). On the other hand, according to Chapman, Vectren's proposed projects afforded

flexibility to respond to changing market conditions, reliable capacity, and full depreciation of stranded costs.

[11] Wayne D. Games, Vice President of Power Supply at Vectren, testified that a 20-year analysis skews the economic modeling. He also indicated that it would take 4 years to construct replacement generation and, in the meantime, customers would be exposed to market and reliability risks.

[12] Despite the criticisms of Dr. Fisher, J. Neil Copeland of B & V continued to maintain that a 10-year model was prudent. He also disputed Dr. Fisher's contentions of analytical errors in B & V's model and noted problems with Dr. Fisher's 20-year analysis. Further, Copeland indicated that the cost differences between the alternatives were fairly small and opined that decisions about future generations should not be made solely on these small differences. He noted the importance of management judgment and consideration of risks of capacity shortages.

[13] On January 28, 2015, the IURC issued an order (the First Order) approving Vectren's petition in total. The order is lengthy but only a portion of it is relevant to this appeal. After setting out in detail the evidence presented by the parties, the IURC issued the following relevant discussion and findings:

> **C. Deferred Recovery under Ind. Code ch. 8-1-8.8.** Under Ind. Code § 8-1-8.8-11(a)(5), the Commission can authorize other financial incentives that it considers appropriate for clean energy projects only if the projects are found to be reasonable and necessary.

Vectren submitted evidence showing that failure to comply with the federally mandated requirements would require Vectren to retire Brown, Culley, and Warrick, which make up approximately 85% of its baseload generation, in 2015. The Mandated Projects will enable the continued operation of the facilities for at least the next ten years and continued service to Vectren's customers.

Vectren evaluated several alternative compliance technologies that would allow the Brown, Culley, and Warrick units to comply with pollution limits....

Vectren hired Black & Veatch to further evaluate the most promising technologies and consider alternatives for bringing its generation fleet in compliance with federal regulations....

***

Vectren also considered whether the continued operation of Brown units 1 and 2, Culley unit 3, and Warrick unit 4 was the best option. Vectren submitted production cost modeling supporting its plan to continue investing in, rather than retire, Brown, Culley, and Warrick. Specifically, Vectren presented a ten-year production cost model using PROMOD IV prepared by Black & Veatch. Vectren also engaged Burns & McDonnell to conduct an analysis over a 20-year period to respond to concerns by the Joint Intervenors and OUCC.

The evidence presented by Vectren shows that failure to complete the Mandated Projects could require the premature retirement of the related generation facilities, which would result in significant reliability, market, and regulatory risk. MISO is projecting capacity shortfalls as early as 2016 and constructing a new gas generation facility would take at least four years. Without the ability to obtain voltage support from distant generators to serve

its territory, Vectren would be forced to purchase capacity in an already constrained market. All of these factors point to concerns that retirement of Brown and Culley would expose Vectren's customers to significant reliability risks. Based on the evidence presented, we find that the Mandated Projects are reasonable and necessary.

*Appellants' Appendix* at 20-21.

[14] Intervenors appealed the First Order arguing that the IURC "failed to make necessary findings on (1) facts material to its determination of the issues and (2) statutory factors required to be addressed prior to authorizing the use of clean coal technology." *Vectren I*, 45 N.E.3d at 485. Intervenors appealed the approval of all of Vectren's proposed projects.

[15] We issued our opinion in *Vectren I* on October 29, 2015. After a thorough review of relevant Indiana utility and CCT statutes, we determined that two of the proposed projects – those using injection systems designed to mitigate sulfur emissions – required issuance of a CPCN under I.C. chapter 8-1-8.7.[6] In its First Order, however, the IURC based its decision to approve all of the projects on I.C. chapters 8-1-8.4 and 8.8.[7] In light of this error, we remanded on a limited basis and instructed:

---

[6] The projects concerning mercury emissions are not considered CCT projects for purposes of Chapter 8.7 because they do not reduce airborne emissions of sulfur or nitrogen based pollutants. *Id.* at 496.

[7] We noted, "a finding that the projects were reasonable and necessary under Chapter 8.8 does not change the fact that Vectren was required to obtain a CPCN before using new CCT and that the Commission was required to make findings under Chapter 8.7 before granting a CPCN thereunder." *Vectren I*, 45 N.E.3d at

Vectren may not use CCT (as defined in Chapter 8.7) until the Commission issues them a CPCN under Indiana Code section 8-1-8.7-3. On remand, the Commission shall make findings on the factors listed in Section 8-1-8.7-3(b) regarding the soda ash and hydrated lime injection systems which qualify as CCT under Chapter 8.7 and, based on those findings, determine whether those systems serve public convenience and necessity.

*Vectren I*, 45 N.E.3d at 498.

[16] On February 12, 2016, Intervenors filed a petition to reopen the evidentiary record, asserting material changes of fact since the close of the evidentiary hearing. Vectren objected to this petition.

[17] The IURC issued its order on remand (the Second Order) on June 22, 2016. After denying Intervenors' request to reopen the record, the IURC made findings with respect to I.C. § 8-1-8.7-3(b):

> Under Ind. Code § 8-1-8.7-3(b), the Commission shall issue a CPCN if it finds that a clean coal technology project offers substantial potential to reduce sulfur or nitrogen based pollutants in a more efficient manner than conventional technologies in general use as of January 1, 1989. When determining whether to grant a CPCN, the Commission must consider specific factors, which are addressed below.
>
> **A. <u>The costs for constructing, implementing, and using CCT compared to the costs for conventional emission reduction facilities</u>**. Vectren estimated the costs for all projects

---

495. Additionally, we concluded that "a CPCN granted under Chapter 8.4 would not be sufficient to satisfy the CPCN requirement of Chapter 8.7." *Id.* at 497.

approved in [this cause] to be in the range of $75-$95 million. Vectren supplied a breakdown of the estimated costs by project as a confidential filing, which includes the estimated costs for the Brown and Culley Projects. No party disputed the estimated costs.

Ms. Fischer[8] testified that Black and Veatch considered several alternative technologies, including fuel switching, coal washing, boiler flue gas temperature control, furnace sorbent injection, and others. Ms. Fischer further testified that the Brown and Culley Projects were selected because the preliminary screening showed them to be the most cost effective. The evidence presented sufficiently describes the Mandated Projects Costs and demonstrates that the components of the Mandated Projects offer substantial potential to cost-effectively reduce pollutants.

**B.** **Whether a CCT project will extend the useful life of an existing electric generating facility and the value of that extension**. Mr. Games testified that the Brown and Culley Units have not reached the end of their useful lives. He said that the Brown and Culley Projects are necessary to resolve the [NOV] issued by the [EPA] and to allow the continued operation of the Brown and Culley Units. Mr. Chapman testified that the Brown and Culley Projects would extend the useful lives of Vectren's plant for another ten years, allowing Vectren to fully depreciate its prior capital investments in emission controls and to avoid stranded costs.

**C.** **The potential reduction of sulfur and nitrogen based pollutants achieved by the proposed CCT system**. Mr. Games testified that under the NOV, Vectren has agreed to

---

[8] Diane Fischer testified as the Air Quality Control Services Leader in the Energy Division at B & V.

install sodium-based sulfur trioxide ("$SO_3$") mitigation systems on both Brown Units. The systems will reduce sulfuric acid ("$H_2SO_4$") emissions to 0.008 lb/mmbtu (pounds per million British thermal units) on Brown Unit 1 and 0.010 lb/mmbtu on Brown Unit 2. Vectren has also agreed to install a $SO_3$ mitigation system on Culley Unit 3, which will reduce $H_2SO_4$ emissions to 0.009 lb/mmbtu.

**D. The reduction of sulfur and nitrogen based pollutants that can be achieved by conventional pollution control equipment**. Mr. Games testified that soda ash injection (Brown Units) and hydrated lime injection (Culley Unit) are required for $SO_3$ mitigation. There is no evidence that any conventional pollution control equipment could achieve the necessary $SO_3$ reductions. Vectren analyzed several alternative technologies and fuel sources to achieve the necessary $SO_3$ reductions, but that analysis focused primarily on the economic impact of the scenarios.

**E. Federal sulfur and nitrogen based pollutant emission standards**. Mrs. Retherford[9] testified that Vectren received an NOV from the EPA alleging that Vectren failed to acquire Prevention of Significant Deterioration ("PSD") construction permits prior to construction of the SCRs to address small incremental increases in incidental $SO_3$ emissions caused by operation of the SCRs, and a CAA §114 Information Request related to the 2003 Culley Consent Decree. Vectren and the EPA have reached a settlement in principle to resolve the outstanding compliance allegations brought by the EPA in the

---

[9] Angela Retherford testified as Vice President of Environmental Affairs and Corporate Sustainability at Vectren.

NOV and the CAA §114 Information Request that requires the Culley and Brown Air Projects.

**F. The likelihood of success of the proposed project**. Ms. Fischer described the Phase 1 Technology Demonstration of the Brown and Culley Projects. At Brown, Black & Veatch used a temporary soda ash injection system, which treated 100% of the flue gas on Unit 1. The soda ash injection reagent flow rate, process data, and stack gas outlet measurements were all collected, and the data obtained allowed Black & Veatch to determine the optimum amount of soda ash that should be injected to balance sorbent consumption, mercury reduction, and $N_sSO_4$ mist reduction.

Ms. Fischer testified that at Culley, highly reactive hydrated lime was injected at the inlet and outlet of the particulate matter removal device. Black & Veatch performed the test at different injection rates to evaluate the effect of the amount of hydrated lime injection on $H_2SO_4$ mist removal. As with Brown, the data obtained allowed Black & Veatch to determine the necessary sizing of the lime injection system.

**G. The cost and feasibility of retirement of an existing electric generating facility**. Mr. Games testified that Vectren hired Burns & McDonald and Black & Veatch to analyze alternative generation options to retrofitting Brown Units 1 and 2 and Culley Unit 3. The analysis included both the variable operating costs of the proposed alternatives and the annual fixed charge required to recover capital costs and fixed operating costs under various capacity scenarios. In addition, the analysis considered that the Brown and Culley Units are base load units; so any replacement technology must be able to supply the necessary capacity to meet the MISO-required Planning Reserve Margin.

The analysis considered 20 commercial generating technologies, including seven natural gas options, battery storage, compressed air, wind, solar, hydro, nuclear, wood, landfill gas, and coal. Of those options, Black & Veatch identified two, a 200 MW, Class F natural gas fired generation facility and a 300 MW natural gas fired combined cycle generation facility, as the most practical options. The other options were determined to be infeasible due to cost, size, or environmental reasons.

Black & Veatch compared the two replacement options to the retrofitting option on the basis of total customer cost and relative risk. The analysis was run under three separate market scenarios and adjusted to those scenarios for variables including natural gas costs and carbon costs. The analysis compared 21 different replacement scenarios to the retrofitting option, and in every scenario except one, the analysis demonstrated that retrofitting was the lowest cost alternative. The only scenario that favored replacement, was a low natural gas and high carbon cost scenario that showed a 2.2% benefit by replacing Brown Units 1 and 2 with a combined cycle natural gas facility.

**H. The dispatching priority for the facility utilizing CCT, considering direct fuel costs, revenues, and expenses of the utility, and environmental factors associated with byproducts resulting from the utilization of the CCT**. Mr. Games testified that any changes in dispatching priority will depend on future regulations, fuel costs, and future load growth. He said that the additional variable production costs of using additives to reduce $SO_3$ emissions will increase the cost to generate a MW of electricity, but that Black & Veatch's analysis shows that replacing the Brown and Culley Units would be a more expensive option.

Mr. Games also testified that the Brown and Culley Projects will allow for the continued reuse of the fly ash from the Brown and Culley Units for the production of cement and gypsum wall board. Mr. Games said that while Vectren is not paid for the fly ash, the reuse is beneficial to customers because Vectren avoids disposal costs.

**I.** **Any other factors the Commission considers relevant, including whether the construction, implementation, and use of CCT is in the public's interest**. Mr. Games testified that Vectren cannot continue to operate the Brown and Culley Units without investing in additional pollution control equipment to comply with the NOV. Vectren has evaluated alternative technologies and the possibility of retiring the units and identified the Brown and Culley Projects as the lowest cost alternative. Retiring the Brown and Culley Units would retire 76% of Vectren's coal-fired base load, which would require Vectren to construct new generation facilities to replace the capacity or to purchase capacity on the open market. Market Purchases would also place a large percentage of Vectren's base load energy need outside of its direct control. Because the Brown and Culley Units have not reached the end of their useful lives, retiring them early would result in significant stranded costs. In addition, Vectren would experience stranded costs related to infrastructure in place to capture, store, and transport fly ash for reuse. For these reasons, we find that it is in the public interest for Vectren to install the Brown and Culley Projects.

**J.** **Conclusion**. Based on our analysis of the factors required by Ind. Code § 8-1-8.7-3(b), we find that public convenience and necessity will be served by the use of CCT, specifically the Brown and Culley Projects, on Brown Units 1 and 2 and Culley Unit 3. In our January 28, 2015 Order in this Cause, we approved the estimated costs, and found that Brown Units 1 and 2 and Culley Unit 3 will continue to utilize Indiana coal

as their primary fuel, specifically coal [] sourced from the Illinois Basin.  Therefore, we issue a CPCN to Vectren for the Brown and Culley Projects.

*Id*. at 8-11.[10]  Intervenors appeal from this order.

## Discussion & Decision

Standard of Review

[18]  The General Assembly created the IURC primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature.  *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.,* 907 N.E.2d 1012, 1015 (Ind. 2009).  The IURC's goal is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana.  *Id.*  An order from the IURC is presumed valid unless the contrary is clearly apparent. *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.,* 485 N.E.2d 610, 612 (Ind. 1985).

[19]  The standard for our review of decisions of the IURC is governed by I.C. § 8-1-3-1, which our courts have interpreted as providing a tiered standard of review.

> A multiple-tier standard of review is applicable to the IURC's orders.  A court on review must inquire whether specific findings exist as to all factual determinations material to the ultimate conclusions; whether substantial evidence within the record as a

---

[10] Headings A through I directly correspond with the factors listed in I.C. § 8-1-8.7-3(b).

whole supports the findings of fact; and whether the decision, ruling, or order is contrary to law.

*Vectren I*, 45 N.E.3d at 491.  In applying this standard, "[w]e review the conclusions of ultimate facts, or mixed questions of fact and law, for their reasonableness, with greater deference to matters within the IURC's expertise and jurisdiction." *Citizens Action Coal. of Ind., Inc. v. Duke Energy Ind., Inc.*, 16 N.E.3d 449, 457 (Ind. Ct. App. 2014).  Additionally, "[w]e neither reweigh the evidence nor assess the credibility of witnesses and consider only the evidence most favorable to the IURC's findings." *Ind. Gas Co., Inc. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 66 (Ind. 2013).  On matters within its jurisdiction, the IURC enjoys wide discretion and its findings and decision will not be lightly overridden simply because we might reach a different decision on the same evidence. *Vectren I*, 45 N.E.3d at 491.

## Adequacy of Findings on Remand

[20] Intervenors challenge the adequacy of the IURC's findings on remand, arguing that they are not adequately explained, are arbitrary and capricious, and are not supported by substantial evidence.  Their grievance stems from the notion that the IURC failed to consider any evidence other than Vectren's pre-filed direct testimony.  Had the IURC considered the other evidence, according to Intervenors, it would have concluded that the long-term cost of installing pollution controls on the existing units would be more than the cost of building new natural gas plants and retiring existing coal-fired units.

[21] Initially, we observe that the First Order remained intact after *Vectren I*. This order contained a detailed summary of the evidence presented by the parties, which included over 2000 pages of written testimony and exhibits and two days of live testimony. Although the IURC considered the voluminous evidence on both sides, it based its ultimate decision and findings in the First Order primarily on Vectren's evidence. For example, in finding the proposed projects to be reasonable and necessary, the IURC expressly relied upon the evidence presented by Vectren, including Games's testimony and the B & V 10-year model. The IURC's reliance on the B & V model indicates that Vectren won the battle of the experts in the First Order.

[22] In *Vectren I*, we did not reverse the First Order. Rather, we did nothing more than remand for additional findings with regard to two of the proposed projects. We directed the IURC to make findings on the nine statutory factors listed in I.C. § 8-1-8.7-3(b) and balance these factors to determine whether to grant a CPCN. The IURC did just that.

[23] We cannot agree with Intervenors that, on remand, the IURC was required to consider the expert testimony regarding the cost models anew. Further, Intervenors' assertion that Copeland abandoned his original B & V 10-year analysis for a "corrected analysis" at the hearing is a mischaracterization of the evidence. *Appellants' Brief* at 21. At the hearing, Copeland steadfastly stood by his opinion that a 10-year analysis was more appropriate than a 20-year

analysis.[11]  Further, to the extent he adjusted the assumptions used in his 10-year model to reflect Dr. Fisher's assumptions, Copeland testified that he was "not totally in agreement" with the assumptions.[12]  *Id.* at 374.  Additionally, Copeland testified that the revised results should "absolutely not" change Vectren's conclusions on the proposed compliance plan.  *Id.* at 373.  He noted that "changes in the variable costs can change the outcome very easily" and given the "uncertainty in the future, [he] would not think it would be prudent to make an $800 million fixed cost investment".  *Id*. at 374.

[24]  Intervenors' arguments amount, essentially, to a claim that the IURC credited the wrong expert testimony.  This is an improper contention on appeal, as it requires a reweighing of the evidence.  There is substantial evidence in the record to support the IURC's findings regarding the cost effectiveness of the proposed projects as compared to retirement of the existing units.  Moreover, the cost analysis was not the sole basis of the IURC's decision to issue the CPCN to Vectren.  The IURC issued specific findings on all nine statutory factors as set out above, many of which had nothing to do with the cost

---

[11] Copeland testified in this regard:

> [T]he original analysis was done on ten years, and I feel very confident with that given the uncertainty we could see in the future, and because we don't know exactly what the future looks like, we felt like it was prudent to look at a ten-year analysis, and we still stand by that.

*Transcript* at 377.

[12] Regarding the addition of capacity sales to his model, Copeland testified that he did not believe it is appropriate to include revenue from excess capacity sales.  He was then asked why he included this assumption in his revised model.  Copeland responded, "I was responding to Dr. Fisher's comments about capacity sales not being included and wanted to analyze the impact if those were added in there."  *Id.* at 214.

analysis. Based on its consideration of all of these factors, the IURC determined that public convenience and necessity will be served by the use of CCT at Brown Units 1 and 2 and Culley Unit 3. Intervenors have failed to establish that the IURC abused the broad discretion granted it.

## Petition to Reopen Record

[25] Intervenors argue that the IURC erred by declining to reopen the record on remand to hear additional evidence. With their petition, Intervenors attached evidence purporting to show that the existing units would face higher costs than originally assumed and the cost to run new plants would be lower. Other evidence submitted indicated that the projections of a capacity deficit in the region were no longer accurate.

[26] The IURC denied the petition as follows:

> 170 IAC 1-1.1-22 allows a party to move to reopen the record[13] "At any time after the record is closed, but before a final order is issued." The Commission has already issued a final order based

---

[13] In petitioning to reopen the record, the petitioner

must set forth clearly the facts claimed to constitute grounds requiring reopening of the proceedings, including the following:

(1) Material changes of fact or law alleged to have occurred since the conclusion of the hearing.

(2) The reason or reasons such changes of fact or law could not have been reasonably foreseen by the moving party prior to the closing of the record.

(3) A statement of how such changes of fact or law purportedly would affect the outcome of the proceeding if received into evidence.

(4) A showing that such evidence will not be merely cumulative.

170 Ind. Admin. Code 1-1.1-22(b). While it sets out the requirements of such a petition, 170 I.A.C. 1-1.1-22 does not establish a standard of review. Accordingly, we conclude that the determination of whether to grant or deny a petition to reopen the record is within the IURC's sound discretion.

on the evidentiary hearing in this Cause. Although the Court of Appeals remanded the final order for the Commission to consider the limited issue of whether a CPCN should be issued for the proposed soda ash and hydrated lime injection systems, the court did not instruct the Commission to receive additional evidence; nor did it bar the Commission from receiving additional evidence if necessary. Therefore, it is within the Commission's discretion to determine whether the record should be reopened to receive additional evidence.

In this case, we find that there is sufficient evidence in the evidentiary record to make the required findings under Ind. Code § 8-1-8.7-3. [Intervenors], in asserting that new evidence might change the original analysis, amounts to a request that the Commission engage in hindsight review, which we decline to do. Therefore, the Motion is denied.

*Appellants' Appendix* at 8.

[27] In its First Order, the IURC granted Vectren's petition for approval of all the proposed projects. In *Vectren I*, this court did not reverse the First Order but simply remanded the case for additional findings with respect to two of the projects. Given the volatile utility market, the cost analyses and facts on which the First Order was based were sure to change over time (i.e., while the First Order was being appealed) but this is no reason to *require* the IURC to reopen the evidence and re-litigate the case with respect to the two remaining projects.

[28] Under the circumstances presented here, we conclude that the IURC did not abuse its discretion by denying the petition to reopen the record. There was ample evidence in the record from which the IURC could evaluate the statutory

factors on remand, and thus there was no need for additional evidence. *See Citizens Action Coal. of Ind., Inc. v. Duke Energy Ind., Inc.*, 44 N.E.3d 98, 110 (Ind. Ct. App. 2015).

[29] Affirmed.

Riley, J. and Crone, J., concur.