## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 07 2017, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Robert E. Heidorn
P. Jason Stephenson
Vectren Corporation
Evansville, Indiana

Wayne C. Turner
Patrick A. Ziepolt
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA ENERGY ASSOCIATION

Derek R. Molter
Jenny R. Buchheit
Mark R. Alson
Kay E. Pashos
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UTILITY
REGULATORY COMMISSION

Curtis T. Hill, Jr.
Attorney General of Indiana

David Lee Steiner
Deputy Attorney General
Indianapolis, Indiana

Beth Krogel Roads
General Counsel

Jeremy R. Comeau
Assistant General Counsel
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA INDUSTRIAL GROUP

Todd A. Richardson
Joseph P. Rompala
Lewis Kappes, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc.,

*Appellant-Petitioner,*

v.

Indiana Utility Regulatory Commission,

*Appellee-Administrative Agency,*

and

Indiana Office of Utility Counselor,

*Appellee-Statutory Representative,*

and

Citizens Action Coalition of Indiana, Inc.,

*Appellee-Intervenor*

March 7, 2017

Court of Appeals Case No. 93A02-1604-EX-914

Appeal from the Indiana Utility Regulatory Commission

The Honorable Carol A. Stephan, Commission Chair

The Honorable James Huston and The Honorable David Ziegner, Commissioners

The Honorable Loraine L. Seyfried, Chief Administrative Law Judge

IURC Cause No. 44645

**Crone, Judge.**

# Case Summary

[1]      As required by statute, Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren South" or "Petitioner"), filed a petition with the Indiana Utility Regulatory Commission ("Commission") seeking approval of its Electric Demand Side Management ("DSM") Plan for 2016-2017 ("Plan"). The Plan outlined Vectren South's

energy-efficiency ("EE") programs and their budgets and costs, including lost revenues resulting from reduced demand for electricity. Indiana law requires the Commission to allow an electricity supplier to recover reasonable lost revenues associated with an energy-efficiency plan. The Commission held an evidentiary hearing and issued an order purporting to find the Plan to be reasonable in its entirety but limiting lost revenue recovery to four years or the life of the energy-efficiency measure, whichever is less, or until rates are implemented pursuant to a final order in Vectren South's next base rate case, whichever occurs earlier.

[2] Vectren South now appeals, arguing that the Commission erred in finding the Plan to be reasonable in its entirety but capping lost revenue recovery at four years. Vectren South also argues that the cap is arbitrary and capricious because the Commission made no specific factual findings that the cap would allow for the recovery of reasonable lost revenues. We agree on both counts and therefore reverse and remand for further proceedings.

## Facts and Procedural History

[3] Vectren South is a public utility based in Evansville that "provides electric utility service to approximately 140,000 customers in six counties in southwestern Indiana." Appealed Order at 2. In June 2015, Vectren South filed a petition with the Commission seeking approval of the Plan pursuant to Indiana Code Section 8-1-8.5-10 ("Section 10"), which reads in pertinent part as follows:

(h) Beginning not later than calendar year 2017, and not less than one (1) time every three (3) years, an electricity supplier[1] shall petition the commission for approval of a plan that includes:

(1) energy efficiency goals;

(2) energy efficiency programs to achieve the energy efficiency goals;[2]

(3) program budgets and program costs [including lost revenues and financial incentives approved by the commission under subsection (o)[3]]; and

(4) evaluation, measurement, and verification ["EM&V"] procedures that must include independent evaluation, measurement, and verification.

An electricity supplier may submit a plan required under this subsection to the commission for a determination of the overall reasonableness of the plan either as part of a general basic rate proceeding or as an independent proceeding.…

---

[1] "Electricity supplier" means a public utility "that furnishes retail electric service to customers in Indiana." Ind. Code § 8-1-8.5-10(a). The term does not include a municipally owned utility and certain other corporations. *Id.*

[2] "Energy efficiency" means "a reduction in electricity use for a comparable level of electricity service." Ind. Code § 8-1-8.5-10(b). "Energy efficiency goals" means "all energy efficiency produced by cost effective plans that are: (1) reasonably achievable; (2) consistent with an electricity supplier's integrated resource plan; and (3) designed to achieve an optimal balance of energy resources in an electricity supplier's service territory." Ind. Code § 8-1-8.5-10(c). "Energy efficiency program" or "program" means "a program that is: (1) sponsored by an electricity supplier; and (2) designed to implement energy efficiency improvements. The term does not include a program designed primarily to reduce demand for limited intervals of time, such as during peak electricity usage or emergency conditions." Ind. Code § 8-1-8.5-10(d).

[3] Ind. Code § 8-1-8.5-10(g)(3). "Lost revenues" means "the difference, if any, between: (1) revenues lost; and (2) the variable operating and maintenance costs saved; by an electricity supplier as a result of implementing energy efficiency programs." Ind. Code § 8-1-8.5-10(e).

….

(j) In making a determination of the overall reasonableness of a plan submitted under subsection (h), the commission shall consider the following [ten factors, including]:

….

(4) The inclusion and reasonableness of procedures to evaluate, measure, and verify the results of the energy efficiency programs included in the plan, including the alignment of the procedures with applicable environmental regulations, including federal regulations concerning credits for emission reductions.

….

(8) The lost revenues and financial incentives associated with the plan and sought to be recovered or received by the electricity supplier.

….

(10) Any other information the commission considers necessary.

(k) If, after notice and hearing, the commission determines that an electricity supplier's plan is reasonable in its entirety, the commission shall:

(1) approve the plan in its entirety;

(2) allow the electricity supplier to recover all associated program costs on a timely basis through a periodic rate adjustment mechanism; and

(3) allocate and assign costs associated with a program to the class or classes of customers that are eligible to participate in the program.

….

(m) If, after notice and hearing, the commission determines that an electricity supplier's plan is not reasonable in its entirety, the commission shall issue an order setting forth the reasons supporting its determination. The electricity supplier shall submit a modified plan within a reasonable time. After notice and hearing, the commission shall issue an order approving or denying the modified plan. If the commission approves the modified plan, the commission shall allow the electricity supplier to recover program costs associated with the modified plan on a timely basis through a periodic rate adjustment mechanism.

….

(o) If the commission finds a plan submitted by an electricity supplier under subsection (h) to be reasonable, the commission shall allow the electricity supplier to recover or receive the following:

(1) Reasonable financial incentives that:

(A) encourage implementation of cost effective energy efficiency programs; or

(B) eliminate or offset regulatory or financial bias:

> (i) against energy efficiency programs;[4] or
>
> (ii) in favor of supply side resources.
>
> (2) Reasonable lost revenues.[5]
>
> A retail rate adjustment mechanism proposed by an electricity supplier under this section to implement the timely recovery of program costs (including reasonable lost revenues) may be based on a reasonable forecast, with consideration given to the electricity supplier's historical lost revenue forecasting accuracy. If forecasted data is used, the retail rate adjustment mechanism must include a reconciliation mechanism to correct for any variance between the forecasted program costs (including reasonable lost revenues and financial incentives) and the actual program costs (including reasonable lost revenues and financial incentives based on the evaluation, measurement, and verification of the energy efficiency programs under the plan).
>
> ….
>
> (q) The commission shall adopt:

---

[4] A reduction in demand for electricity may lead to a reduction in a utility's revenues, which in turn may lead to a financial bias against promoting demand-reducing programs.

[5] Vectren South points out that this provision is inconsistent with 170 Indiana Administrative Code ("IAC") 4-8-6(a), which states that the Commission "*may* allow the utility to recover the utility's lost revenue from the implementation of a demand-side management program sponsored or instituted by the utility." (Emphasis added.) We note that an administrative agency may not make rules or regulations inconsistent with the statute it is administering. *Ind. Dep't of State Revenue v. Best Ever Cos.*, 495 N.E.2d 785, 787 (Ind. Ct. App. 1986).

> (1) rules under IC 4-22-2; or
>
> (2) guidelines;
>
> to assist electricity suppliers and industrial customers in complying with this section.

[4] Citizens Action Coalition of Indiana, Inc. ("CAC"), was allowed to intervene in Vectren South's proceeding. In November 2015, the Commission held an evidentiary hearing at which Vectren South, CAC, and the Indiana Office of Utility Consumer Counselor ("OUCC") appeared and presented evidence. In March 2016, the Commission issued a twenty-eight-page order, which reads in relevant part as follows:

> **6. Vectren South 2016-2017 Plan.** The 2016-2017 Plan includes the following DSM programs, the majority of which are current programs …: [residential lighting, home energy assessment and weatherization, appliance recycling, and smart thermostats, as well as commercial and industrial new construction and retrofit programs, among others].
>
> **7. Evidence.**
>
> [The Commission summarized the often conflicting evidence and recommendations presented by Vectren South, the OUCC, and CAC, including those regarding lost revenues and cost recovery. The accuracy and adequacy of these findings are not at issue here.]
>
> **8. Discussion and Commission Findings.** Vectren South requests approval of its Energy Efficiency Plan and authority to recover program costs, lost revenues, and performance incentives associated with the 2016-2017 Plan through its DSMA [demand

side management adjustment] in accordance with [Indiana Code Section 8-1-8.5-9] and [Section] 10 and the DSM Rules [adopted by the Commission, i.e., 170 Indiana Administrative Code ("IAC") 4-8].

....

**B. Reasonableness of the 2016-2017 Plan.** Having determined that Vectren South has submitted an EE plan as required by Section 10(h), Section 10(j) identifies ten factors the Commission must consider in determining its overall reasonableness.... For the reasons set forth below, we find that Vectren South's 2016-2017 Plan is reasonable and should be approved.

....

**iv. EM&V.** Evaluation for all programs in the Plan will be conducted by an independent evaluator every year for the prior year's programs....

....

Based on the evidence presented, we find that Vectren South's proposed EM&V procedures to independently verify the results of its proposed programs and the estimated EM&V costs are reasonable. Petitioner shall file its annual evaluation in its DSMA proceeding.

....

**viii. Lost Revenues and Financial Incentives.** Petitioner's requested lost revenues and financial incentives are discussed in detail below.

....

**D. Lost Revenues and Performance Incentives.** ....

Because we have found Vectren South's 2016-2017 Plan is reasonable, we must consider whether Petitioner's request for financial incentives and lost revenues associated with its EE programs is reasonable. We also note that 170 IAC 4-8 authorizes the provision of financial incentives and lost revenues that the Commission finds reasonable for DR programs. Accordingly, we consider them together.

**i. Lost Revenues.** Vectren South seeks to recover lost revenues associated with its 2016-2017 Plan in the same manner in which it has been authorized to recover lost revenues associated with its DSM programs previously. Both the OUCC and CAC generally oppose Petitioner's recovery of lost revenues.

Both the OUCC and CAC argue that lost revenues should be authorized only if Petitioner has experienced a reduction in kWh [kilowatt hour] sales compared to the kWh sales used to set rates in its last base rate case. The OUCC presented evidence that Vectren South's sales had exceeded test year sales for calendar years 2010 through 2014. However, on rebuttal, Vectren South pointed out that the increase in sales was attributable to industrial customers who had opted out of EE and that this trend is expected to reverse due to a large industrial customer's plans to begin self-generating in 2017. [Vectren Utility Holdings, Inc.'s Vice President of Customer Energy Solutions Robert C. Sears] testified that should sales continue to remain flat to declining, implementation of the EE programs will cause lost revenues that are not covered by load growth.

As we have previously explained, because the purpose of lost revenue recovery is to return the utility to the position it would have been in absent implementation of DSM, simply eliminating lost revenue recovery when sales are higher than the levels used to develop a utility's current base rates would be contrary to this purpose. Recovery of lost revenues is intended as a tool to remove the disincentive a utility would otherwise face as a result

of promoting DSM in its service territory....

The OUCC and CAC appear to be primarily concerned with what [CAC consultant Natalie Mims] termed the pancake effect, which is caused when lost revenues caused by EE investments in different years aggregate. For example, if the average weighted measure life is ten years for an EE measure then the utility company, assuming there is no rate case in the interim, would still be collecting lost revenues in 2025 for measures installed in 2016, along with lost revenues for measures installed during 2017-2025.[6]

The proposed annual budgets for the 2016-2017 Plan show lost revenue as a percentage of the total budget is 11.8% in 2016 and 12.5% in 2017. Ms. Mims noted that Petitioner is requesting $2.5 million in lost revenues, but that this amount does not appear to include the legacy lost revenues, incremental or cumulative lost revenues for 2015 through 2017 that Petitioner has requested or is receiving, or the total amount of lost revenues that Vectren South has recovered.

---

[6] According to the Commission, Mims testified that

Vectren did not provide a breakdown of lost revenue by program or year, or any evidence that it will under-recover authorized costs due to the impacts of its EE programs. She testified it is unreasonable to recover lost revenues if there is no evidence that the revenues are actually lost. She also testified that lost revenue recovery is meant to be a short-term solution to address revenue loss in between rate cases. She stated that in the absence of a rate case, Vectren South will continue to add lost revenues from prior years to existing years for EE measures that are still in service, which is known as the Pancake Effect. Accordingly, she recommended that if recovery of lost revenue is allowed, it should be limited to three years or the life of the measure, whichever is shorter, to avoid the Pancake Effect. She indicated that the rationale for a cap of three years of lost revenue can be found in [Senate Enrolled Act 412, enacted as Section 10], which requires the utilities to submit EE plans at least once every three years.

Appealed Order at 11. In Vectren South's rebuttal, Sears

disagreed with Ms. Mims that the Pancake Effect warranted limiting lost revenues because the lost revenues reflect a history of successful EE and DSM programs that produce significant savings each year. Mr. Sears testified that the average life of the weighted program savings in the Plan is 6.6 years with 31% of the program savings having an average life of three years or less for the residential sector; an average life of the weighted program savings of 10.9 years for the commercial sector and 8.5 years for the overall portfolio.

Id. at 12.

Although we have previously approved lost revenues over a measure's life or until a utility's next base rate case, whichever is shorter, Ms. Mims' and the other parties' concerns with pancaking and the increased length of time between base rate cases for utilities in Indiana raise a valid concern. Clearly, pancaking of lost revenue is much less of an issue in an environment where a utility comes in regularly, i.e., every three to five years, for a base rate case. When the Commission's DSM Rules were adopted in the early 1990's, the previous 20 years was characterized by routine and sometimes almost back-to-back rate case filings where utilities' rates were reset on a regular basis. Consequently, recovery of lost revenues at that time was viewed as a tool of limited duration until the utility filed its next base rate case in the not too distant future. However, in the years after adoption of the DSM Rules, utilities have been staying out for ten or more years before filing for a rate case. *E.g., Indianapolis Power & Light*, 19 years between Cause No. 38664 (IURC 8/23/95) and pending Cause No. 44576; *Southern Indiana Gas & Electric Co.*, 12 years between Cause No. 39871 (IURC 6/21/95) and Cause No. 43111 (IURC 8/15/07); *Duke Energy Indiana, Inc.*, last rate case was filed 13 years ago in Cause No. 42359 (IURC 5/18/04, rh'g denied 7/28/04).

Because we believe the parties raise a valid concern, we find that Vectren South's lost revenue recovery should be limited to: (1) four years or the life of the measure, whichever is less, or (2) until rates are implemented pursuant to a final order in Vectren South's next base rate case, whichever occurs earlier. We note that the CAC also requested that the Commission initiate some type of formal process to develop a standard methodology for Indiana utilities to calculate lost revenues for an EE measure. Because Section 10 authorizes the recovery of reasonable lost revenues to utilities with an approved EE plan and Section 10(q) requires the Commission to adopt rules implementing the requirements of Section 10, we fully expect that this issue will be addressed in that future rulemaking.

....

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

1. Vectren South's 2016-2017 Plan is approved as set forth in this Order.

2. Vectren South's request for timely recovery of all costs, including program costs, lost revenues, and financial incentives associated with the 2016-2017 Plan, through its DSMA is approved consistent with the terms of this Order.

Appealed Order at 5-28 (underlining and citations to administrative orders omitted). Vectren South now appeals.[7]

# Discussion and Decision

The General Assembly created the Commission primarily as a factfinding body with the technical expertise to administer the regulatory scheme devised by the legislature. *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). "The Commission can exercise only power conferred upon it by

---

[7] Unlike the Indiana Department of Workforce Development's Review Board, the Commission is not made a party appellee in every appeal of its decisions pursuant to statute. *Cf.* Ind. Code § 22-4-17-12(b). In a recent unrelated appeal involving Vectren South, we granted the appellant intervenors' motion to dismiss the Commission as a party to the appeal, agreeing with their argument that because the Commission "acted as a fact-finding administrative tribunal and no statute or administrative provision expressly makes the [Commission] a party on appeal, it is not a proper party on appeal from its own decision." *Citizens Action Coalition of Indiana, Inc. v. S. Ind. Gas & Elec. Co.*, No. 93A02-1607-EX-1637, 2017 WL 587261, at *1 n.1 (Ind. Ct. App. Feb. 14, 2017). One of the intervenors in that case was CAC, which has not filed a brief in this appeal. We decline to dismiss the Commission in this case sua sponte.

statute." *Id*. Indiana Code Section 8-1-3-1 authorizes judicial review of Commission orders by this Court. The review involves multiple tiers. *Id*. "On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it." *Id*. at 1016 (citation and footnote omitted). We neither reweigh evidence nor assess witness credibility, and we consider only the evidence favorable to the Commission's findings. *Id*. The Commission's order is not binding if it is unreasonable or arbitrary. *Id*.

[6] "At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions." *Id*. We review the Commission's conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *Id*. If the order involves a subject within the Commission's special competence, we should give it greater deference; if the subject is outside the Commission's expertise, we give it less deference. *Id*. Findings of fact are important because they help us understand the Commission's reasoning and policy judgments and allow for a reasoned and informed basis of review, which decreases the likelihood that we will substitute our judgment on complex evidentiary issues and policy determinations best left to an agency with technical expertise. *N. Ind. Pub. Serv. Co. v. LaPorte*, 791 N.E.2d 271, 278 (Ind. Ct. App. 2003).

Further, requiring findings of fact helps the Commission avoid arbitrary and capricious action. *Id.*

[7] "Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *U.S. Steel*, 907 N.E.2d at 1016. "Courts should consider a statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *In re Dunn*, 848 N.E.2d 310, 316 (Ind. Ct. App. 2006).

> The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Where the language of a statute is clear and unambiguous, courts should apply the statute without resort to further aids of statutory construction. It should be presumed that the legislature did not intend an absurd, inconvenient, or unjust result.

*Id.* (citations and quotation marks omitted). We give considerable deference to an interpretation of a statute by an administrative agency charged with administering the statute, but that interpretation is not binding on us when it is incorrect or if the legislative intent is obvious. *Sadler v. State ex rel. Sanders*, 811 N.E.2d 936, 953-54 (Ind. Ct. App. 2004).

[8] In challenging the Commission's order in this case, Vectren South makes several interrelated arguments, one of which is that the Commission erred as a matter of law by approving its "energy-efficiency plan 'in its entirety' but then rejecting the portion of that plan addressing lost revenue recovery." Appellant's

Br. at 31. Vectren South asserts that Section 10 "calls for a single reasonableness inquiry that considers the ten factors in subjection (j). Recovery of lost revenues is included in this reasonableness inquiry." *Id*. Based on the plain language of the statute, we agree. *See* Ind. Code § 8-1-8.5-10(j)(8) (requiring Commission to consider lost revenues sought to be recovered by electricity supplier in determining overall reasonableness of plan).[8] By capping lost revenue recovery at four years, the Commission implicitly found Vectren South's lost revenue recovery proposal to be unreasonable.[9]

[9] Vectren South also argues that the Commission's four-year cap is arbitrary and capricious, noting that "[t]he basis for capping lost revenue recovery is never tied to a finding that recovery equal to DSM measure life would be unreasonable[,]" that the cap "effectively throws out twenty years of [the

---

[8] Because the relevant portions of Section 10 are unambiguous, we decline the invitation of Vectren South and amicus Indiana Energy Association to use legislative history to interpret them. *See Orr v. Turco Mfg. Co.*, 484 N.E.2d 1300, 1302 (Ind. Ct. App. 1985) ("When a statute is unambiguous, legislative history should not be used to determine its meaning."), *trans. denied* (1986).

[9] 170 IAC 4-8-5(b), which was readopted by the Commission two years before Section 10 was enacted by the legislature, provides that the Commission "shall determine the cost recovery mechanism for a demand-side management program when the demand-side management program is submitted for commission approval." We note, however, that Section 10(o) contemplates that an electricity supplier will propose its own cost recovery mechanism as part of its plan and that Section 10(k) contemplates that the electricity supplier will be allowed to "recover all associated program costs" (including reasonable lost revenues) through that mechanism if the Commission determines that the plan is reasonable in its entirety. We reiterate that an administrative agency may not make rules or regulations inconsistent with the statute it is administering. *Best Ever Cos.*, 495 N.E.2d at 787.

Commission's own precedent] regarding lost-revenue recovery[,]"[10] and that "[t]he Commission appears to have picked a number that arbitrarily splits the difference between a frequently observed measure-life and a 3-year cap proposal [by CAC]." Appellant's Br. at 35, 36, 37; n.6 *supra*. Indeed, as Vectren South points out, the financial effect of the four-year cap is "*unknown* to the Commission" because no party proposed a four-year cap or "presented data about its economic effect." *Id*. at 38, 39.[11] A four-year cap may have the superficial virtues of simplicity and uniformity,[12] but the Commission made no specific factual findings that the cap would allow Vectren South to recover reasonable lost revenues as provided in Section 10(o).[13]

---

[10] The Commission observes that "this is the first plan submitted by Vectren [South] under the new statutory framework in Section 10" and that "[a]n agency may change its course and is not forever bound by prior policy or precedent" as long as it explains its reasons for the change. Appellee's Br. at 24 (citing *Cmty. Care Ctrs., Inc. v. Ind. Dep't of Pub. Welfare*, 523 N.E.2d 448, 450-51 (Ind. Ct. App. 1988)). The problem here is that the Commission's change of course regarding lost revenue recovery is unsupported by adequate factual findings.

[11] Vectren South observes that although the Commission expressed "concern" about the pancaking of lost-revenue recovery, it failed to explain "why it believes pancaking is *bad*" or "why the amount of pancaking that will occur with a 4-year cap is reasonable, but the amount that will occur with a smaller or larger cap is not." Appellant's Br. at 39. On page 17 of its appellate brief, the Commission quotes from a document that Mims cited regarding the alleged difficulty of tracking the pancake effect over time, but the Commission did not specifically rely on this document in its order or specifically find that the independent EM&V required by statute (and approved by the Commission) is unable to adequately account for this effect. The Commission addresses EM&V on pages 18 through 20 of its brief, but this is too little, too late.

[12] The Commission notes that it "similarly capped lost revenue recovery at four years" in two recent orders involving other utilities and that neither utility appealed. Appellee's Br. at 24. The legal actions or inactions of other utilities are irrelevant here.

[13] Contrary to the suggestion of amicus Indiana Industrial Group, Vectren South is not seeking recovery of "unlimited" lost revenues. Amicus Br. of Indiana Industrial Group at 15.

[10] Consequently, we reverse the Commission's order and remand for further proceedings consistent with this opinion. On remand, the Commission may either (1) issue specific factual findings to justify its implicit determination that Vectren South's lost revenue recovery proposals are unreasonable, determine that the Plan is not reasonable in its entirety pursuant to Section 10(m), and allow Vectren South to submit a modified plan within a reasonable time; or (2) issue specific factual findings to justify a determination that the Plan is in fact reasonable in its entirety pursuant to Section 10(k) and allow Vectren South to recover reasonable lost revenues in accordance with the Plan.[14]

[11] Reversed and remanded.[15]

Riley, J., and Altice, J., concur.

---

[14] 170 IAC 4-8-6(c) provides that "the approval of a lost revenue recovery mechanism shall not constitute approval of a specific dollar amount, the prudence or reasonableness of which may be debated in a future proceeding before the commission." According to the Commission, Sears testified that Vectren South

> takes a conservative approach to its projected lost revenues to ensure Petitioner is not over-collecting lost revenues from customers. Any over/under collection variance will be recovered in Petitioner's next DSMA filing. He further testified that forecasted program costs will be reconciled against actual results based on EM&V of the EE programs under the Plan.

Appealed Order at 6. The Commission made no findings regarding Vectren South's historical lost revenue forecasting accuracy or reconciliation mechanism as mentioned in Section 10(o).

[15] We need not pass upon the wisdom of the Commission's justification of a four-year cap based on the trend toward less frequent base rate cases. We note, however, that another panel of this Court recently stated that rate cases are "expensive, time consuming, and sometimes result in large, sudden rate hikes for customers." *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 31 N.E.3d 1, 4 (Ind. Ct. App. 2015).